## STATE OF NORTH CAROLINA v. BETTY HASKINS CURTIS

### No. 7025SC64

#### (Filed 6 May 1970)

**1. Criminal Law § 43; Homicide § 20— photograph of deceased after autopsy — admissibility**

A photograph of deceased taken immediately after an autopsy that was performed four days after the alleged shooting, *held* admissible to illustrate the pathologist's testimony that the death was caused by a gunshot wound in the head.

**2. Criminal Law § 43— photograph of body — time — admissibility**

The fact that the photograph was taken and portrays the condition of the body at some time after the homicide occurred does not, of itself, make the photograph incompetent.

**3. Criminal Law § 43— gruesome photographs — admissibility**

The fact that a photograph is gory or gruesome will not alone render it inadmissible.

**4. Criminal Law § 75; Constitutional Law § 37— waiver of rights — issue of defendant's intoxication**

The record fails to support defendant's contention that because of her intoxication she was incapable of knowingly waiving her constitutional rights to have counsel and to remain silent at the time of her interrogation by investigating officers.

**5. Criminal Law § 169— exclusion of testimony — prejudice**

The exclusion of testimony cannot be held prejudicial when the record fails to disclose what the witness' answer would have been had he been permitted to answer.

**6. Criminal Law § 169; Homicide § 15— murder prosecution — exclusion of testimony of accident — harmless error**

In a prosecution for murder in the second degree committed with a pistol, wherein the jury returned a verdict of guilty of involuntary manslaughter, defendant was not prejudiced by the exclusion of his witness' testimony as to whether or not the shooting was an accident, since, assuming the witness would have answered "yes," the answer would have been consistent with the verdict.

**7. Homicide § 6— reckless use of loaded gun**

Any careless and reckless use of a loaded gun which jeopardizes the safety of another is unlawful, and if death results therefrom it is an unlawful homicide.

**8. Homicide § 6— involuntary manslaughter — elements**

The unlawful killing of a human being, unintentionally and without malice, proximately resulting from some act done in a culpably negligent manner, when fatal consequences were not improbable under the existing circumstances, supports a verdict of guilty of involuntary manslaughter.

APPEAL by defendant from `Collier, J.,` 11 August 1969 Session, BURKE Superior Court.

Defendant was charged in a bill of indictment with the murder of Ruby Nell Rutherford, with premeditation and deliberation, on 20 January 1969. The Solicitor for the State announced in open court that the State would not seek a conviction of murder in the first degree, but would seek a conviction of murder in the second degree or manslaughter.

The evidence for the State tended to show the following: The defendant, a 25 year old white female, quit her job on 6 January 1969 and moved into a house in the Lake James section of Burke County which was owned and occupied by Clarence (Chief) Rutherford, a negro male. She lived there at Clarence (Chief) Rutherford's house until 20 January 1969, the date of the alleged offense. During the morning of 20 January 1969 Ruby Nell Rutherford, a negro female, and several negro males gathered at the home of Clarence (Chief) Rutherford. At the time of the alleged offense all of the negro males except Elbert (Goat) Conly had left the house. Ruby Nell Rutherford was sitting on the bed in the house and defendant told her to get up so she could make up the bed. Ruby Nell Rutherford said she would get up when she got ready and defendant told her that she (defendant) stayed there and that Ruby didn't and to get up off the bed. Ruby said "we'll just fight" and defendant said "oh no we won't". Defendant turned and picked a .38 caliber automatic pistol from off the headboard of the bed and pulled the hammer back. When defendant turned around the pistol fired and Ruby fell back across the bed. Elbert (Goat) Conly went for help and carried Ruby Nell Rutherford to the hospital. At the hospital a lead jacket bullet was surgically removed from the head of Ruby Nell Rutherford. She survived until 24 January 1969. On 24 January 1969 an autopsy was performed and in the opinion of the pathologist who performed the autopsy death resulted from the brain damage caused by a penetrating wound to the head.

Defendant's evidence tended to show the following: Since 6 January 1969, when defendant moved into the house owned and occupied by Clarence (Chief) Rutherford, defendant had been drinking various alcoholic beverages regularly up until 20 January 1969, the day of the alleged offense. During the morning in question defendant was drinking beer and Ruby Nell Rutherford was drinking whiskey. Ruby Nell Rutherford and defendant were friends. Ruby Nell Rutherford was sitting on the bed and defendant was sitting in a chair.

Defendant told Ruby Nell Rutherford to get up off the bed and Ruby said she would when she got ready. Defendant walked over, picked up the gun and when she turned it went off. Defendant said, "Oh my lord Goat, look what I've done". Elbert (Goat) Conly then took Ruby to the hospital.

Upon defendant's plea of not guilty she was tried by jury which found her guilty of involuntary manslaughter. From the verdict and judgment of confinement for not less than six nor more than ten years, defendant appealed.

*Attorney General Morgan, by Assistant Attorney General Smith, for the State.*

*Simpson & Martin, by Wayne W. Martin, for defendant.*

BROCK, J.

[1]   Defendant assigns as error the admission in evidence of a photograph of deceased taken immediately after the autopsy which was performed four days after the alleged shooting. She argues stressfully that the sole purpose of the photograph was to inflame the minds of the jurors, to excite their passion, and prejudice them against the defendant. She does not argue or contend the photograph was inaccurate in any particular.

[2, 3]   The fact that the photograph was taken and portrays the condition of the body at some time after the homicide occurred does not, of itself, make the photograph incompetent. *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241. And, the fact that a photograph is gory or gruesome will not alone render it inadmissible. *State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10.

On 24 January 1969 Dr. John C. Reese, an admitted medical expert, and practicing pathologist, performed an autopsy upon the body of Ruby Nell Rutherford to determine the cause of her death. He testified in detail concerning his examination of the skull and brain to determine the cause of death. In his opinion "the track of the damage to the brain had been produced by a penetrating wound consistent with the track of the bullet." Dr. Reece also testified:

"The brain was rather severely swollen and the swelling was in the area of the wound. In my opinion, death resulted from the brain damage and the destruction of the brain tissue and the swelling of which also caused the development of pneumonia."

There had been no admission or stipulation by defendant that

Ruby Nell Rutherford died as the result of a gunshot wound to the head; therefore, under her plea of not guilty, the burden was upon the State to satisfy the jury beyond a reasonable doubt that the death was caused by a gunshot wound to the head. The photograph met the test of relevance to illustrate the doctor's testimony as to how the cause of death was determined by him; its admission in evidence was not error.

[4] Defendant's assignments of errors Nos. 2, 3, 5 and 6 relate to the evidence of both oral and written statements by defendant to Mr. Wade McGalliard, chief investigator for the Burke County Sheriff's Department. It is defendant's contention that because of her intoxication she was incapable of knowingly waiving her constitutional rights to presence of counsel and to remain silent. There is no contention that she was not properly advised of all of her rights.

The record before us discloses no serious condition of intoxication at the time of the shooting or at the time of interrogation. One of defendant's witnesses who left the house moments before the shooting said he heard no kind of argument. He stated that defendant was drinking a beer, and he also stated: "While I was in the house, I did not hear any conversation other than normal conversation in a normal tone. It was just a usual conversation in regular tones." Nowhere did he indicate that anyone was obviously intoxicated.

Another of defendant's witnesses, who was an eye witness to the shooting, stated: "When I went into the room, I saw Betty Curtis had some beer." However, nowhere did this witness indicate that anyone was obviously intoxicated.

When Deputy McGalliard went to Clarence (Chief) Rutherford's house to investigate the shooting he said that defendant "had a beer in her hand when I walked into the house." Deputy McGalliard testified that he had known defendant for five or six years, and had seen her when she was sober and had seen her when she was drunk. He testified that at the time he interrogated defendant she had been drinking and to a certain extent she was under the influence of alcohol. However, he further testified that she showed him where the pistol was located, told him what had transpired, and did not say anything to indicate that she didn't understand what she was being questioned about. Later Deputy McGalliard typed defendant's statement, she read it, said it was correct, and signed it. Defendant did not testify. There is nothing in this record to support a conclusion that defendant was intoxicated to an extent that would render her incapable of giving a free and voluntary confession. These assignments of error are overruled.

**[5-8]**    Defendant's assignment of error No. 4 challenges the ruling of the trial judge in sustaining the State's objection to the following question propounded to defendant's witness Elbert (Goat) Conly: "Elbert, did this what occurred up there appear to you to be an accident?" The record does not disclose what the witness' answer would have been had he been permitted to answer, therefore the exclusion of the testimony cannot be held prejudicial. *State v. Kirby,* 276 N.C. 123, 171 S.E. 2d 416; *State v. Huffman,* 7 N.C. App. 92, 171 S.E. 2d 339. Nevertheless, if we assume the witness would have answered "yes", the answer would have been consistent with the verdict rendered. "Any careless and reckless use of a loaded gun which jeopardizes the safety of another is unlawful, and if death results therefrom it is an unlawful homicide." *State v. Brooks,* 260 N.C. 186, 132 S.E. 2d 354. The unlawful killing of a human being, unintentionally and without malice, proximately resulting from some act done in a culpably negligent manner, when fatal consequences were not improbable under the existing circumstances, supports a verdict of guilty of involuntary manslaughter. 4 Strong, N.C. Index 2d, Homicide, § 6, p. 198. "It seems that, with few exceptions, it may be said that every unintentional killing of a human being proximately caused by a wanton or reckless use of firearms, in the absence of intent to discharge the weapon, or in the belief that it is not loaded, and under circumstances not evidencing a heart devoid of a sense of social duty, is involuntary manslaughter." *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889.

Defendant's final assignment of error is to failure of the trial court to grant her motion for involuntary nonsuit. The evidence taken in the light most favorable to the State was clearly sufficient to support a finding that defendant was culpably negligent in handling the pistol. It seems that the jury returned its verdict consistent with defendant's evidence and defense.

No error.

BRITT and GRAHAM, JJ., concur.